IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WARREN R. HARRIS,<br>1438 Minnesota Avenue SE<br>Washington, DC 20020,<br><br>        Plaintiff,<br><br>   v.<br><br>MURIEL E. BOWSER,<br>in her official capacity as the Mayor of the<br>District of Columbia,<br>John A. Wilson Building<br>1350 Pennsylvania Avenue NW<br>Washington, D.C. 20004,<br><br>TANYA A. ROYSTER,<br>in her official capacity as the Director of the<br>D.C. Department of Behavioral Health,<br>64 New York Avenue NE, 3rd Floor<br>Washington, D.C. 20002,<br><br>MARK J. CHASTANG,<br>in his official capacity as Chief Executive<br>Officer of St. Elizabeths Hospital,<br>1100 Alabama Avenue SE<br>Washington, D.C. 20032,<br><br>QUINCY L. BOOTH,<br>in his official capacity as Director of the D.C.<br>Department of Corrections,<br>2000 14th Street NW, 7th Floor<br>Washington, D.C. 20009,<br><br>        Defendants. | Civil Action No.<br><br><br><br><br>COMPLAINT FOR DECLARATORY AND<br>INJUNCTIVE RELIEF, AND FOR<br>COMPENSATORY DAMAGES<br><br>JURY TRIAL DEMAND |

**INTRODUCTION**

1.      This Complaint seeks relief from practices conducted under the authority of

Mayor Muriel E. Bowser, Mayor of the District of Columbia ("D.C." or "District"), Mark J.

Chastang, CEO of St. Elizabeths Hospital ("St. Elizabeths" or "Hospital"), a public psychiatric

facility charged with providing mental health services within the District and operated by Tanya

A. Royster, Director of the D.C. Department of Behavioral Health ("DBH"), and Quincy L. Booth, Director of the D.C. Department of Corrections, subjecting patients under the care and custody of St. Elizabeths to unwarranted and unconstitutional restraint when transporting patients to and from St. Elizabeths and D.C. Superior Court to attend court hearings about the status of their commitment at St. Elizabeths.

2.      The seclusion and restraint practices challenged in this Complaint involve Plaintiff Warren Harris, a 65-year-old man who was committed to the custody of St. Elizabeths for treatment in 1981, after being found "not guilty by reason of insanity" for one misdemeanor count of possession of a prohibited weapon. Mr. Harris spent a significant portion of the next 36 years either receiving inpatient care at St. Elizabeths or living full-time in the community on "convalescent leave" (outpatient treatment in the community by DBH) pursuant to conditional release orders issued by the D.C. Superior Court.

3.      Mr. Harris was last returned to inpatient care at St. Elizabeths in October 2014. On January 17, 2017, the Hospital issued a certificate to the D.C. Superior Court, recommending that Mr. Harris be conditionally released to live in the community on convalescent leave on the basis that he would not pose a danger to himself or others if so released. As a result, the D.C. Superior Court scheduled a court hearing to be held on April 5, 2017 to address the Hospital's request.

4.      On April 5, 2017, instead of providing Mr. Harris direct transportation to court as his custodian, St. Elizabeths illegally and impermissibly turned over custody of Mr. Harris to the DOC, which placed him in five-point metal restraints and deprived him of his shoelaces and belt, forcing him to hold onto his trousers throughout his hearing to prevent his pants from falling. This is despite the fact that: (1) the DOC had no authority to take custody of Mr. Harris and place

him in such restraints; (2) there was no evidence or finding that Mr. Harris posed either a flight risk or a risk of danger to himself or others; (3) Mr. Harris had been granted conditional Class "E" status, the highest level of patient privilege granted by the Hospital and which permitted him to leave Hospital grounds multiple days a week without supervision; and (4) the Hospital itself recommended Mr. Harris to the court as a candidate for conditional release precisely because he did not pose any such risk. Mr. Harris, through his counsel, was subsequently informed that alternative transportation for a subsequent court hearing would be impossible as it would not be in line with the "practice" of the Hospital and DBH. As a result of the physical and emotional pain and suffering, degradation, and humiliation Mr. Harris experienced by being transported in shackles and St. Elizabeths' subsequent refusal to provide alternate means of transportation, Mr. Harris chose to waive his presence at a subsequent court hearing, despite his right to be present and heard.

5.      By filing this action, Plaintiff seeks redress from the wrongs imposed on him as a result of his unconstitutional restraint by the practices of the District, DBH, St. Elizabeths, and the DOC, as conducted under the authority of the Defendants.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the United States Constitution, the laws of the United States, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to this action occurred in this District.

## PARTIES

### Plaintiff Warren Harris

8.     Plaintiff Warren Harris is a 65-year-old man, originally committed to St.
Elizabeths in 1981 after being found not guilty by reason of insanity for one count of
misdemeanor possession of a prohibited weapon (a knife from his kitchen). Mr. Harris has spent
the majority of the next 36 years receiving either inpatient care while residing within St.
Elizabeths or outpatient care while living in the community on convalescent leave. Mr. Harris
was most recently returned to inpatient care at St. Elizabeths on October 15, 2014, and was
subsequently conditionally released pursuant to an order issued by Chief Judge Robert Morin of
the D.C. Superior Court on May 3, 2017, finding that Mr. Harris will not, in the reasonably
foreseeable future, present a danger to himself or others because of mental illness if conditionally
released, after St. Elizabeths recommended the conditional release upon finding that Mr. Harris
would not pose a danger to himself or others if so released.

9.     According to terminology used by St. Elizabeths and DBH, Mr. Harris is
considered to be a "forensic" patient, to denote that he or she is being treated by a mental health
services facility for reasons related to his involvement in the criminal justice system. This
includes hospitalizations to evaluate the patient's competency to stand trial, restoring such
competency, and rehabilitating patients after being found not guilty by reason of insanity.

10.     According to terminology used by St. Elizabeths and DBH, patients can
alternatively be "civil" patients, to note that he or she is being treated by a mental health services
facility for reasons not involving the criminal justice system. This includes civil commitments
made upon a judicial finding that the individual is mentally ill and because of the illness is likely
to injure him/ herself or other persons if not committed. *See* D.C. Code 21-541, et seq.

**Muriel E. Bowser, Mayor of the District of Columbia**

11.     Defendant Muriel E. Bowser is the Mayor of the District of Columbia, and is being sued in her official capacity.

12.     The District of Columbia is responsible for the organization and supervision of D.C. administrative agencies and services, including DBH, St. Elizabeths, and the DOC.

13.     As the Mayor, Defendant Bowser is responsible for developing, administering, and enforcing the policies and procedures of DBH, St. Elizabeths, and the DOC.

14.     The Mayor's principal office is located at the John A. Wilson Building, 1350 Pennsylvania Avenue NW, Washington, D.C. 20004.

**Tanya A. Royster, Director of DBH**

15.     Defendant Dr. Tanya A. Royster is the Director of DBH, and is being sued in her official capacity.

16.     DBH is responsible for the planning, development, coordination and monitoring of comprehensive and integrated mental health systems of care for adults and for children, youth, and their families in the District of Columbia. D.C. Code § 7-1141.04(1). DBH also operates St. Elizabeths Hospital to provide inpatient mental health services within the District. Id. § 7-1141.04(4).

17.     As the Director of DBH, Defendant Royster is responsible for developing, administering, and enforcing policies and practices regarding the treatment (including seclusion and restraint) of patients receiving inpatient mental health services in the District, including those provided by St. Elizabeths.

18.     DBH's principal office is located at 64 New York Avenue, N.E., 3rd Floor, Washington, D.C. 20002.

**Mark J. Chastang, CEO of St. Elizabeths**

19.     Defendant Mark J. Chastang is the chief executive officer ("CEO") of St. Elizabeths, and is being sued in his official capacity.

20.     St. Elizabeths is a public psychiatric facility run by DBH, providing, among other services, "District of Columbia court system forensic psychiatry referral, evaluation, and patient treatment services for prisoners, and for individuals awaiting trial or requiring post-trial or post-sentence psychiatric evaluation." D.C. Code § 44-901(a)(4)(D).

21.     As the CEO of St. Elizabeths, Defendant Chastang is responsible for developing, administering, and enforcing policies and practices regarding the treatment (including seclusion and restraint) of patients receiving inpatient mental health services in St. Elizabeths.

22.     St. Elizabeths' principal office is located at 1100 Alabama Avenue, S.E., Washington, D.C. 20032.

**Quincy L. Booth, Director of DOC**

23.     Defendant Quincy L. Booth is the Director of the DOC, and is being sued in his official capacity.

24.     The DOC is responsible for the safekeeping, care, protection, instruction, and discipline of "all persons committed to" the "Workhouse at Occoquan in the State of Virginia, the Reformatory at Lorton in the State of Virginia, and the Washington Asylum and Jail," D.C. Code § 24-211.02(a); and "all persons detained at the Central Cellblock [located at 300 Indiana Avenue, N.W., Washington, D.C.], or detained at a medical facility in the District, by the Metropolitan Police Department, before their initial court appearance." Id. § 24-211.02(a-1).

25.     As the Director of the DOC, Defendant Booth is responsible for developing, administering, and enforcing DOC policies and practices regarding the transport of pre-trial

detainees, prisoners, and other individuals under DOC's custody to D.C. Superior Court.

26.     The DOC's principal office is located at 2000 14th Street, N.W., 7th Floor, Washington, D.C. 20009.

## FACTUAL ALLEGATIONS

I.  **Background Information on Relevant Laws, Regulations, Procedures, and Policies**

   A.  **Commitment of Forensic Patients Found Not Guilty by Reason of Insanity to St. Elizabeths**

27.     According to D.C. Code § 24-501(d)(1), "[i]f any person tried upon an indictment or information for an offense raises the defense of insanity and is acquitted solely on the ground that he was insane at the time of its commission, he shall be committed to a hospital for the mentally ill until such time as he is eligible for release."

28.     A post-trial forensic patient committed to St. Elizabeths under D.C. Code § 24-501(d)(1) may become eligible for release from the hospital by one of several procedures. Under one procedure, the court holds a hearing within 50 days of the patient's automatic commitment, determining whether, by a preponderance of the evidence, the confined person is entitled to be released from custody or whether further treatment is required. Id. § 24-501(d)(2).

29.     Under another procedure, the hospital superintendent may issue a certificate certifying that (1) "such person has recovered his sanity"; (2) "in the opinion of the superintendent, such person will not in the reasonable future be dangerous to himself or others"; and (3) "in the opinion of the superintendent, the person is entitled" to either conditional or unconditional release from the hospital. Id. § 24-501(e). The court may then choose to either grant the recommended release, or hold a hearing to determine whether the recommended release is warranted. Id.

30.     Finally, a post-trial forensic patient may himself "move the court having

jurisdiction to order his release, to release him from custody, to change the conditions of his release, or to grant other relief." Id. § 24-501(k).

31.     While receiving inpatient treatment in St. Elizabeths, patients are classified into various "privilege" levels.

32.     According to St. Elizabeths internal policy, Class "A" privileges are assigned to individuals whose "[p]sychiatric symptoms are compromising [their] ability to accompany staff outside of locked areas of [the] hospital; or [who are] not participating in recommended treatment; or [have a] lack of insight into [their] mental disorder; or [a] history of aggressive/assaultive behavior; or [a] history of unauthorized leave while exercising privileges." St. Elizabeths Policy No. 102.02, at 12.

33.     According to St. Elizabeths internal policy, "Class 'A' status individuals with a forensic legal status leaving the building must be in metal waist and leg restraints that are used in accordance with [St. Elizabeths restraints policy]. For Class A individuals with a pre-trial status, transport to court shall be provided by the Department of Corrections (DOC) or US Marshalls Service as applicable." Id. § III.P.1.a.

34.     According to St. Elizabeths internal policy, Class E privileges are granted to individuals who are "[p]sychiatrically stable and actively participating in treatment and [have a] proved track record of assuming responsibility for [their] own actions and [are] highly motivated to transition to [the] community on Conditional Release." Id. at 12.

35.     According to St. Elizabeths internal policy, "[i]ndividuals with Class E privileges may have accompanied (by non-SEH staff such as family, community support workers and case managers) or unaccompanied community access during specified times other than, or in addition to, those identified for" individuals with a more restrictive privilege level. Id. § III.O.5.

36.     St. Elizabeths internal policy states that "[i]t is the policy of Saint Elizabeths Hospital (SEH) to provide transportation services to patients when necessary and requiring transport to or from court, and other locations." St. Elizabeths Policy No. 401-02, § I.

**B. Seclusion and Restraint of Forensic Patients Treated by St. Elizabeths**

37.     In recognition of the fact that when "a person is institutionalized" and "wholly dependent on the State" the State has a "duty to provide certain services and care," Youngberg v. Romeo, 457 U.S. 307, 317 (1982), the D.C. Mental Health Consumers' Rights Protection Act of 2001 ("MHCRPA"), codified in D.C. Code § 7-1231.01 et seq., defines the rights of "consumers" ("adults, children, or youth who seek or receive mental health services or mental health supports in the District of Columbia … without regard to voluntary, non-protesting, or involuntary status," id. at § 7-1231.02(4)) receiving mental health treatment within the District.

38.     These rights include the "right to be free from seclusion and restraint of any form that is not medically necessary or that is used as a means of coercion, discipline, convenience, or retaliation by staff." Id. at § 7-1231.09(a).

39.     Under the MHCRPA, seclusion or restraint "can be used only in an emergency when: (1) The use of seclusion or restraint is, in the written opinion of the attending physician, necessary to prevent serious injury to the consumer or others; (2) Less restrictive interventions have been considered and determined to be ineffective to prevent serious injury to the consumer or others; and (3) Pursuant to the written order of the attending physician, which shall never be written as a standing order or on an as-needed basis, and which must be followed by consultation with the consumer's treating physician as soon as possible if the order was not written by the consumer's treating physician." Id. at § 7-1231.09(c)(1)–(3).

40.     In 2005, DBH adopted a series of regulations with the purpose of implementing the MHCRPA. These regulations are codified in Title 22A, Chapter 5 of the D.C. Municipal

Regulations.

41.     As with the MHCRPA, the D.C. Municipal Regulations requires that seclusion or restraint "only be used in an emergency" under similar factors. D.C. Mun. Regs. Tit. 22A § 501.2.

42.     However, according to the D.C. Municipal Regulations, an "emergency" also exists sufficient to warrant restraints if it is a "legally mandated restraint." Id. § 503.2. According to the D.C. Municipal Regulations, legally mandated restraints are the "mechanical restraint of an adult consumer during transport from a hospital to District of Columbia Superior Court or Federal Court or a facility outside of the hospital, applied in accordance with the order of a U.S. Marshall, a judge or other law enforcement official or forensic services policy." Id. § 501.2. Under such situations, "[m]etal handcuffs and anklets are prohibited, except with maximum security consumers, who are secured by forensic services personnel in accordance with forensic services policy approved by the chief clinical officer of DMH, or the order of a judge, U.S. Marshall or other law enforcement agency with appropriate jurisdiction for transport to … [t]he District of Columbia Superior Court." Id. § 513.2. Furthermore, "[a]ll procedures required for application of emergency restraint, which are set forth in this chapter shall be followed, unless specifically superseded by court order or the policy of the law enforcement agency with custody of the consumer." Id. § 513.3.

43.     St. Elizabeths internal policy also states that "[b]ecause of the trauma inducing aspects of seclusion and restraint, as well as the potential for physical and psychological harm and loss of dignity, seclusion or restraint shall only be used in emergency situations that pose an immediate risk of an individual physically harming him/herself, staff or others, when less restrictive interventions are not viable or have been ineffective, and when the individual's

behavior at the time poses a greater risk to self or others than the risk of using seclusion or restraint."  St. Elizabeths Policy No. 103-00, § III.A.1.

## II.  History of Plaintiff's Commitment to St. Elizabeths

44.     On September 21, 1981, after finding Mr. Harris not guilty by reason of insanity for one misdemeanor count of possession of a prohibited weapon, the Chief Judge of the D.C. Superior Court signed and issued an order mandating that Mr. Harris be "committed into the custody of Saint Elizabeth's Hospital pursuant to Title 24, Section 301(d)(1) of the District of Columbia Code [now D.C. Code §§ 24-501(d)(1)] until such time as (he) is ordered released pursuant to Title 24, Section 301(d)(2) or Title 24, Section 301(e) of the District of Columbia Code [now D.C. Code D.C. Code § 24-501(d)(2) and 24-501(e)]" ("1981 Commitment Order").[1]

45.     After being conditionally released from St. Elizabeths and re-committed on multiple occasions for failing to meet the conditions for release, on June 5, 2007, on the recommendation of St. Elizabeths, a judge of the D.C. Superior Court signed and issued a conditional release order permitting Mr. Harris to reside in the community, provided that "if he violates the conditions of this release he may be returned to inpatient care at the Hospital." Order, United States v. Harris, 1981 FEL 24, at 4 (D.C. Super. Ct. Jun. 5, 2007) (hereinafter "2007 Conditional Release Order"). These conditions required, among other items, that Mr. Harris "abide by all laws, not consume alcohol or illegal drugs, and take all medications prescribed to him." Id.

46.     On July 6, 2012, a judge of the D.C. Superior Court signed and issued a judgment sentencing Mr. Harris to a 36-month imprisonment term after being convicted for 1 count of

---

[1] At the same time, but separate and apart from the commitment to St. Elizabeths based on the insanity acquittal, the judge also found Mr. Harris guilty of one count of manslaughter and sentenced him to a term of imprisonment of 7.5 to 25 years. Mr. Harris completed that term of imprisonment and was released in September 1991.

possession of a contracted substance with an intent to distribute and unlawful possession of a

firearm. In the judgment, the judge ordered that Mr. Harris be committed to the custody of the

U.S. Attorney General, to serve his sentence in a facility operated by the U.S. Bureau of Prisons

("BOP"). Judgement in a Criminal Case, United States v. Harris, 2012 CF2 1492 (D.C. Super.

Ct. Jul. 6, 2012).

47.     Upon obtaining custody over Mr. Harris, the BOP transferred him to a federal

prison located in the Eastern District of Kentucky, where Mr. Harris served his imprisonment

term.

48.     On July 6, 2012, St. Elizabeths transmitted a letter to the D.C. Superior Court

requesting that, because he violated the terms of the 2007 Conditional Release Order, a "detainer

be issued on Mr. Harris in order for him to be returned to full inpatient care at St. Elizabeths

Hospital upon adjudication of his current charges" in accordance with the 1981 Commitment

Order placing Mr. Harris in the custody of the St. Elizabeths for inpatient care.

49.     On July 11, 2012, the Chief Judge of the D.C. Superior Court issued an "Order of

Return" to the "UNITED STATES MARSHAL," "CHIEF OF POLICE OF THE DISTRICT OF

COLUMBIA," or "ANY AUTHORIZED LAW ENFORCEMENT OFFICER," ordering that

they "RETURN WARREN R. HARRIS FORTHWITH TO ST. ELIZABETHS HOSPITAL

UPON RELEASE FROM BOP CUSTODY" where "he will receive full inpatient care."

Forthwith Attachment Order of Return, Case No. 1981 FEL 24 (D.C. Super. Ct. Jul. 11, 2012)

("2012 Order of Return").

50.     On October 1, 2014, a magistrate judge of the U.S. District Court for the Eastern

District of Kentucky signed and issued an order mandating that the "United States marshal must

transport the defendant" to the District of Columbia and "deliver the defendant to the United

States marshal for that district, or to another officer authorized to receive the defendant," in order for Mr. Harris to appear before the D.C. Superior Court and be placed back into the custody of St. Elizabeths. Commitment to Another District, <u>United States v. Harris</u>, 55:14-MJ-5166-REW (E.D. Ky. Oct. 1, 2014).

51.     On October 15, 2014, Mr. Harris completed his imprisonment term and was released to the custody of the U.S. Marshal.

52.     Pursuant to the 1981 Commitment Order and the 2012 Order of Return, the U.S. Marshal transported Mr. Harris directly to St. Elizabeths and released Mr. Harris to St. Elizabeths' custody.

53.     After being released to St. Elizabeths' custody, Mr. Harris spent approximately the next two and a half years under the custody and care of St. Elizabeths for mental health treatment and rehabilitation pursuant to the authority of the 1981 Commitment Order.

**<u>Transportation to Court Hearings on April 5 and May 3, 2017</u>**

54.     On January 20, 2016, because of Mr. Harris's progress in his treatment, St. Elizabeths granted Mr. Harris conditional Class "E" status. Class "E" status is the highest level of patient privilege granted by the hospital. Under this status, Mr. Harris was permitted to leave the grounds on his own multiple days a week to attend a day treatment program in the community without direct supervision from St. Elizabeths staff.

55.     On January 17, 2017, St. Elizabeths submitted a request to D.C. Superior Court recommending that he be conditionally released back into the community, on the basis that he would not pose a risk of danger to himself or others if so released.

56.     The D.C. Superior Court scheduled a hearing to determine whether Mr. Harris should be conditionally released from St. Elizabeths, to be held on April 5, 2017.

57.     The D.C. Superior Court transmitted a document entitled "Prisoner Transfer Report—(St. E's only)" for "Reporting Periods: 04/05/2017 to 04/05/2017" to St. Elizabeths and DOC ("Prisoner Transfer Report"). The Prisoner Transfer Report states that a "Warren R. Harris" was scheduled to appear before Chief Judge Robert Morin of the D.C. Superior Court for a "Post Disposition Status Hearing" at 11:30 A.M.

58.     The Prisoner Transfer Report does not bear the signature of a judge of the D.C. Superior Court.

59.     The Prisoner Transfer Report bears no express provisions ordering the DOC to take custody of Mr. Harris from St. Elizabeths.

60.     The Prisoner Transfer Report bears no express provisions ordering that Mr. Harris be transported from St. Elizabeths to D.C. Superior Court, nor to remain in D.C. Superior Court, in five-point restraints and without his belt and shoelaces.

61.     On April 5, 2017, instead of directly transporting Mr. Harris, St. Elizabeths turned over custody of Mr. Harris to the DOC.

62.     There was no indication that Mr. Harris posed or would pose a threat of danger to himself or others, or a risk of flight, on the day of this hearing.

63.     Upon take custody of Mr. Harris, the DOC removed Mr. Harris' shoelaces and belt and subjected him to five-point restraints, whereby his ankles were shackled with metal cuffs and connected with a chain, and his wrists handcuffed and chained to a metal waistband.

64.     The DOC also placed Mr. Harris in a DOC van with Class "A" patients, seated on a bench facing a metal screen dividing male and female patients.

65.     Upon arrival to the courthouse, Mr. Harris was placed in a holding cell before being called to appear before the court.

66.    Mr. Harris' restraints remained in place and his belt and shoelaces were not provided to him during the several hours of traveling to and from St. Elizabeths and the courthouse, waiting in the holding cell, and appearing in court.

67.    While in the courtroom, Mr. Harris could not hold his beltless pants up when they began to fall down due to the restricted movement caused by his restraints. As a result, Court personnel pulled up his pants for him.

68.    At the hearing, the court granted a request by the government to continue the conditional release hearing because counsel for the government had just recently been assigned to the case; the court then scheduled another appearance for May 3, 2017.

69.    On March 1, 2017, counsel for Mr. Harris wrote a letter to St. Elizabeths requesting that St. Elizabeths transport Mr. Harris to his May 3, 2017 hearing, and objecting to St. Elizabeth's transferring custody of Mr. Harris to the DOC to transport him to court in shackles. An in-house attorney for St. Elizabeths responded rejecting the request as not being in line with the "practice" of DBH and St. Elizabeths, and stating St. Elizabeths' refusal to directly transport Mr. Harris unless affirmatively ordered to do so by the court.

70.    It is the practice of St. Elizabeths and DBH to turn over custody of forensic patients to the DOC for transport to and from court.

71.    It is not the policy or practice of St. Elizabeths or DBH to turn over custody of civil patients to the DOC for transportation to and from court.

72.    It is the practice of St. Elizabeths, DOC, and DBH, when allowing DOC to transport forensic patents to and from court, to do so by having the DOC place the patients under restraints by virtue of their forensic status, and to not engage in a case-specific evaluation of the therapeutic consequences of the use of restraints, or an individualized determination that the

circumstances constituted an emergency where there was an immediate risk of an individual physically harming him/herself, staff, or others; less restrictive interventions are not viable or have been ineffective; and the individual's behavior at the time posed a greater risk to self or others than the risk of using seclusion or restraint.

73.     It is not the policy or practice of St. Elizabeths or DBH, when transporting civil patents to and from court, to do so by placing the patients under restraints absent a case-specific evaluation of the therapeutic consequences of the use of restraints, and an individualized determination that the circumstances constituted an emergency where there was an immediate risk of an individual physically harming him/herself, staff, or others; less restrictive interventions are not viable or have been ineffective; and the individual's behavior at the time posed a greater risk to self or others than the risk of using seclusion or restraint.

74.     The Defendants' practices of transporting forensic patients to and from court by providing them custody to the DOC, placing them in shackles, and removing their belt and shoelaces without an individualized determination of whether the circumstances warrant such restraint measures inflicted physical and emotional pain and suffering, by causing Mr. Harris to be physically distressed, embarrassed, demeaned, anxious, and degraded.

75.     As a result of the physical and emotional pain and suffering, degradation, and humiliation Mr. Harris experienced by being transported in shackles and St. Elizabeths' subsequent refusal to provide alternate means of transportation, Mr. Harris chose to waive his presence at a subsequent court hearing, despite his right to be present and heard.

76.     On the day of the May 3, 2017 hearing, St. Elizabeths permitted Mr. Harris to travel independently to his regularly scheduled day treatment program in the community.

77.     At no time since his return to St. Elizabeths for inpatient care in 2014 until his

most recent conditional release hearing on May 3, 2017, was Mr. Harris ever committed to the

Workhouse at Occoquan in the State of Virginia, the Reformatory at Lorton in the State of

Virginia, or the Washington Asylum and Jail, nor was he a person detained at the Central

Cellblock or detained at a medical facility in the District, by the Metropolitan Police Department,

before an initial court appearance.

## LEGAL CLAIMS

### COUNT I
### (Against All Defendants)

### UNREASONABLE SEIZURE IN VIOLATION OF 42 U.S.C. § 1983 AND THE FOURTH AMENDMENT

78.     Mr. Harris re-alleges and incorporates herein the allegations in all preceding

paragraphs.

79.     The Fourth Amendment of the United States Constitution guarantees the right of

the people to be secure in their persons, houses, papers, and effects, against unreasonable

searches and seizures.

80.     It is the practice of St. Elizabeths and DBH to turn over custody of forensic

patients to the DOC for transport to and from court.

81.     It is the practice of St. Elizabeths, DOC, and DBH, when allowing DOC to

transport forensic patients to and from court, to do so by having the DOC place the patients

under restraints by virtue of their forensic status, and to not engage in a case-specific evaluation

of the therapeutic consequences of the use of restraints, or an individualized determination that

the circumstances constituted an emergency where there was an immediate risk of an individual

physically harming him/herself, staff, or others; less restrictive interventions are not viable or

have been ineffective; and the individual's behavior at the time posed a greater risk to self or

others than the risk of using seclusion or restraint.

82.     Mr. Harris was involuntarily committed to the custody of St. Elizabeths, which is overseen and operated by DBH, on September 21, 1981, and most recently involuntarily committed in October 2014. On January 20, 2016, St. Elizabeths conditionally granted Mr. Harris Class "E" status, the highest level of patient privileges, which permitted him to leave the hospital grounds on his own multiple days a week to attend a day program.

83.     On April 5, 2017, Mr. Harris was scheduled to attend a hearing at D.C. Superior Court to consider St. Elizabeths' recommendation that Mr. Harris be conditionally released to live in the community on the basis that he would not pose a risk to himself or to others if so released.

84.     St. Elizabeths did not provide transportation for Mr. Harris to attend the hearing. Instead, on April 5, 2017, the Defendants, acting under color of state law, gave the DOC custody of Mr. Harris to transport him to and from D.C. Superior Court to attend the hearing.

85.     DOC employees, acting under color of state law, shackled Mr. Harris's ankles with metal cuffs and connected them with a chain, handcuffed his wrists and chained them to a metal waistband, and removed his belt and shoelaces.

86.     Mr. Harris traveled in a van operated by the DOC for several hours to the Superior Court and back to St. Elizabeths, and was placed in a holding cell before appearing in court.

87.     During the several hours of traveling to and from St. Elizabeths and the courthouse, waiting in a holding cell, and appearing in court, Mr. Harris's restraints remained in place.

88.     Despite Defendants' claim to the contrary, there is no duly authorized court order

or other legal basis authorizing the DOC to take custody of Mr. Harris to transport him to and from a court hearing on April 5, 2017.

89.     Employees from neither the St. Elizabeths, DBH, nor DOC made an individualized determination of what, if any, probability of dangerous behavior or elopement Mr. Harris posed when transferring custody of Mr. Harris to the DOC and placing him in restraints.

90.     St. Elizabeths did make an individualized determination that it was safe to release Mr. Harris to travel into the community without any supervision to attend his day treatment program.

91.     The unlawful practices conducted under the authority of the Defendants therefore constitute an unreasonable seizure in violation of the Fourth Amendment of the United States Constitution.

92.     Plaintiff seeks declaratory and injunctive relief because he remains subject to being returned to St. Elizabeths for mandatory treatment and has no other adequate remedy to prevent future injury caused by Defendants' violation of his Fourth Amendment right against unreasonable seizure.

## COUNT II
**(Against All Defendants)**

## DEPRIVATION OF FUNDAMENTAL RIGHTS IN VIOLATION OF 42 U.S.C. § 1983 AND THE FIFTH AMENDMENT

93.     Mr. Harris re-alleges and incorporates herein the allegations in all preceding paragraphs.

94.     The Due Process Clause of the Fifth Amendment guarantees fundamental personal immunities, including not only those expressly enumerated in the Bill of Rights, but also fundamental rights implicit in the concept of ordered liberty.

95.     The Fifth Amendment further bars certain government actions regardless of the fairness of the procedures used to implement them, including the arbitrary action of government constituting an abuse of power.

96.     It is the practice of St. Elizabeths and DBH to turn over custody of forensic patients to the DOC for transport to and from court.

97.     It is the practice of St. Elizabeths, DOC, and DBH, when allowing DOC to transport forensic patents to and from court, to do so by having the DOC place the patients under restraints by virtue of their forensic status, and to not engage in a case-specific evaluation of the therapeutic consequences of the use of restraints, or an individualized determination that the circumstances constituted an emergency where there was an immediate risk of an individual physically harming him/herself, staff, or others; less restrictive interventions are not viable or have been ineffective; and the individual's behavior at the time posed a greater risk to self or others than the risk of using seclusion or restraint.

98.     Mr. Harris had a special relationship with St. Elizabeths and DBH as an involuntarily committed patient.

99.     Mr. Harris had a special relationship with DOC because he was involuntarily placed in its custody by St. Elizabeths.

100.    On April 5, 2017, acting under color of state law, St. Elizabeths employees turned over custody of Mr. Harris to the DOC for transportation to and from D.C. Superior Court.

101.    DOC employees shackled Mr. Harris's ankles with metal cuffs and connected them with a chain, and handcuffed his wrists and chained them to a metal waistband, and removed his belt and shoelaces.

102.    Mr. Harris traveled in a van operated by the DOC for several hours to the

Superior Court and back to St. Elizabeths, and placed in a holding cell before appearing in court.

103.    During the several hours of traveling to and from St. Elizabeths and the courthouse, waiting in a holding cell, and appearing in court, Mr. Harris's restraints remained in place.

104.    Defendants' employees knew that Mr. Harris was a Class E patient who was recommended for conditional release and did not pose a danger to himself or others and did not pose a danger of elopement.

105.    Defendants' employees knew that the use of unwarranted seclusion and restraint on patients committed to St. Elizabeths for mental health treatment has a trauma-inducing aspect as well as the potential for physical and psychological harm and loss of dignity.

106.    At no point was there an individualized determination that Mr. Harris posed a risk of dangerous behavior or elopement, and there was no evaluation of the therapeutic consequences of the restraints used against him.  To the contrary, it was St. Elizabeths' professional judgment that Mr. Harris be conditionally released into the community because he was not an undue risk to himself or to others.

107.    The unlawful practices conducted under the authority of the Defendants injured Mr. Harris, as the forced transportation by DOC and placement in unwanted bodily restraints made him feel physically distressed, embarrassed, demeaned, anxious, and degraded.

108.    As a result of the unlawful practices conducted under the authority of the Defendants, forensic patients, including Mr. Harris, have suffered, or will imminently suffer, harm, including stigma, humiliation, physical and emotional distress, and loss of liberty, depriving them of their fundamental rights to adequate medical care and to be free from unwarranted bodily restraints, in violation of the Fifth Amendment of the United States

Constitution.

109.    Plaintiff seeks declaratory and injunctive relief because he remains subject to being returned to St. Elizabeths for mandatory treatment and has no other adequate remedy to prevent future injury caused by Defendants' violation of his Fifth Amendment right to adequate medical care and to be free of unwarranted bodily restraint.

**COUNT III**
**(Against All Defendants)**

**DEPRIVATION OF RIGHT TO LIBERTY WITHOUT DUE PROCESS OF LAW IN VIOLATION OF 42 U.S.C. § 1983 AND THE FIFTH AMENDMENT**

110.    Mr. Harris re-alleges and incorporates herein the allegations in all preceding paragraphs.

111.    Mr. Harris has a significant interest in being free from unwanted bodily restraint as protected under the Fifth Amendment of the United States Constitution.

112.    Mr. Harris was deprived of his liberty interests when DOC employees, acting under color of state law, took custody of Mr. Harris, shackled Mr. Harris's ankles with metal cuffs and connected them with a chain, and handcuffed his wrists and chained them to a metal waistband, and removed his belt and shoelaces.

113.    Under the D.C. Code, D.C. Municipal Regulations, and St. Elizabeths internal policy, an individualized determination must be made as to whether the use of seclusion or restraint is necessary to prevent serious injury to the consumer or others, and whether less restrictive interventions would be ineffective to prevent serious injury to the consumer or others, in order to justify the use of seclusion or restraint against a St. Elizabeths patient.

114.    It is the practice of St. Elizabeths and DBH to turn over custody of forensic patients to the DOC for transport to and from court.

115. It is the practice of St. Elizabeths, DOC and DBH, when allowing DOC to transport forensic patents to and from court, to do so by having the DOC place the patients under restraints by virtue of their forensic status, and to not engage in a case-specific evaluation of the therapeutic consequences of the use of restraints, or an individualized determination that the circumstances constituted an emergency where there was an immediate risk of an individual physically harming him/herself, staff, or others; less restrictive interventions are not viable or have been ineffective; and the individual's behavior at the time posed a greater risk to self or others than the risk of using seclusion or restraint.

116. Mr. Harris was not given any individualized form of pre- or post- deprivation process adjudging that, under the circumstances, Mr. Harris posed a flight risk or a danger to himself or others, or that less restrictive interventions would be ineffective.

117. The unlawful practices conducted under the authority of the Defendants therefore constitute a deprivation of liberty without due process of law in violation of the Fifth Amendment of the United States Constitution.

118. Plaintiff seeks declaratory and injunctive relief because he remains subject to being returned to St. Elizabeths for mandatory treatment and has no other adequate remedy to prevent future injury caused by Defendants' violation of his Fifth Amendment right to due process.

## RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court:

A. Issue a judgment declaring that the acts and practices of the Defendants described herein violate the Fourth and Fifth Amendments to the United States Constitution;

B. Issue an order permanently enjoining the Defendants from engaging in such

unconstitutional and unlawful acts, and to develop policies and procedures for preventing the recurrence of any such unconstitutional and unlawful acts;

C.   Award compensatory damages to be awarded to Warren Harris according to proof at trial;

D.   Award reasonable attorneys' fees and allowable costs of court; and

E.   Award such other and further relief as it may deem appropriate and in the interests of justice.

## DEMAND FOR JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury for all the issues pleaded herein so triable.

Dated: April 4, 2018                              MORGAN, LEWIS & BOCKIUS LLP


                                        By:  ____ */s/ Christian J. Mixter*____
                                            Christian J. Mixter (DC Bar# 352328)
                                            Thomas S. Harman* (DC Bar #384140)
                                            Holly C. Barker* (DC Bar #992714)
                                            Richard G.S. Lee*†
                                            Vineeta Kamath* (DC Bar #230047)
                                            christian.mixter@morganlewis.com
                                            thomas.harman@morganlewis.com
                                            holly.barker@morganlewis.com
                                            richard.g.lee@morganlewis.com
                                            vineeta.kamath@morganlewis.com

                                            1111 Pennsylvania Avenue, NW
                                            Washington, DC  20004
                                            Telephone:      +1.202.739.3000
                                            Facsimile:      +1.202.739.3001

                                            Attorneys for Plaintiff


* *pro hac vice* application forthcoming
† Admitted to the Bars of New York and New Jersey, admission to the Bar of the District of Columbia pending; supervised by Members of the Bar of the District of Columbia