UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WARREN R. HARRIS,<br>Plaintiff,<br><br>v.<br><br>MURIEL E. BOWSER, *et al.*,<br>Defendants. | Civil Action No. 18-768 (CKK) |

**MEMORANDUM OPINION**
(October 1, 2021)

Plaintiff Warren R. Harris ("Plaintiff" or "Mr. Harris") moves this Court for summary judgment in favor of his Fifth Amendment substantive and procedural due process claims, pursuant to Federal Rule of Civil Procedure 56(a), and further moves to exclude the report and testimony by Defendants' expert, Mr. Tim Gravette. Defendants Mayor Muriel E. Bowser, Director of the District of Columbia Department of Behavioral Health ("DBH") Barbara J Bazron, Chief Executive Officer of St. Elizabeths Hospital Mark J. Chastang, and Director of the District of Columbia Department of Corrections ("DOC") Quincy L. Booth (collectively, the "Defendants") – having been sued in their official capacities only – oppose the Plaintiff's motions and cross-move for summary judgment.[1]   For the reasons explained herein, Plaintiff's [55] Motion for Summary

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Barbara J. Bazron, the current Directory of DBH, is automatically substituted for original defendant Tanya A. Royster. In connection with this Memorandum Opinion and the accompanying Order, the Court considered the following documents: (1) Plaintiff's Motion for Summary Judgment ("Pl.'s Mot."), ECF No. 55 (which encompasses Plaintiff's Statement of Points and Authorities in support thereof and Plaintiff's Statement of Undisputed Material Facts ("Pl's SUMF")); (2) the Declaration of Richard Lee [counsel for Plaintiff] in support of Plaintiff's Motion for Summary Judgment, and the exhibits attached thereto ("Lee Decl."), ECF No. 56; (3) Defendants' Opposition to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary Judgment, and the exhibits attached thereto (referred to primarily as "Defs.' Opp'n" although it is also a Cross-Motion), ECF No. 60 (which encompasses the Memorandum of Points and Authorities in Support thereof); (4) Defendants'

Judgment is DENIED; Plaintiff's [57] Motion to Exclude the Expert Report and Testimony of Tim

Gravette is DENIED; and Defendants' [60] Cross-Motion for Summary is GRANTED.

## I. Background

In presenting the facts pertinent to resolving the present motions, this Court "assume[s] that

facts identified by the moving party in its statement of material facts are admitted, unless such a fact

is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1).

In most instances the Court shall cite to Plaintiff's [55] Statement of Undisputed Material Facts ("Pl's

SUMF"), unless Defendants dispute or controvert relevant aspects of a fact proffered by Plaintiff.  In

such instances, the Court shall also cite to Defendants' [61-1]  Response to Plaintiff's Statement of

Undisputed Material Facts ("Defs.' Resp. to SUMF") and/or to Defendants' [60-5] Statement of

Undisputed Material Facts ("Defs.' SUMF"), with cites to Plaintiff's [64-1] Response to Defendants'

Statements of Undisputed Material Facts   ("Pl.'s Resp. to SUMF"), as needed. The Court shall also

cite directly to the record, where appropriate, to provide additional information not covered by the

parties' Statements of Material Facts, or to provide applicable references to testimony and exhibits.

---

Response to Plaintiff's Statement of Undisputed Material Facts ("Defs.' Resp. to SUMF"), ECF No. 61-1; (5) Defendants' Statement of Undisputed Material Facts in Support of Cross-Motion for Summary Judgment, ("Defs.' SUMF"), ECF No. 60-5; (6) Plaintiff's Reply in Support of Motion for Summary Judgment  and Opposition to Defendants' Cross-Motion, and the exhibits attached thereto ("Pl.'s Reply"), ECF No. 64; (7) Plaintiff's Response to Defendants' Statement of Undisputed Material Facts ("Pl.'s Resp. to SUMF"), ECF No. 64-1; (8) Defendants' Reply in Support of Cross-Motion ("Defs.' Reply"), ECF No. 70; (9) Plaintiff's Motion to Exclude the Expert Report and Testimony of Mr. Tim Gravette ("Pl.'s Mot. To Exclude"), ECF No. 57; (10) Declaration of Richard G.S. Lee in support of Motion to Exclude, and the exhibits attached thereto ("Lee Second Decl."), ECF No. 58; (11) Defendants' Opposition to Plaintiff's Motion to Exclude ("Defs.' Opp'n to Mot. to Exclude"), ECF No. 62; (12) Plaintiff's Reply in support of Motion to Exclude ("Pl.'s Reply to Mot. to Exclude"), ECF No. 65; and (13) the entire record in this case.

In an exercise of its discretion, the Court finds that holding oral argument would not be of assistance in rendering its decision. *See* LCvR 7(f).

Plaintiff was committed to St. Elizabeths Hospital (the "Hospital") in 1981 after being found not guilty by reason of insanity ("NGRI") of a violent crime.[2]   Patients involuntarily committed to the Hospital are assigned a "Privilege Level," ranging from Class A through Class E, which refers to the authorized access by patients to public areas of the Hospital, the Hospital grounds, and the community.  Pl.'s SUMF ¶¶ 5-6; *see* Hospital Policy No. 102-02, attached as Ex. A to Lee Declaration.  Plaintiff challenges the Defendants' use of restraints during Plaintiff's transport to court on April 5, 2017, as  a violation of his substantive and procedural due process rights under the Fifth Amendment.  *See generally* Complaint, ECF No. 1.

Hospital Policy No. 401-02, *Transportation of Patients*, which was in effect during Plaintiff's April 2017 transport provides in relevant part that "[i]t is the policy of Saint Elizabeths Hospital (SHE) to provide transportation services to patients when necessary and requiring transport to or from court, and other locations."  Pl.'s SUMF ¶ 10; *see* Hospital Policy No. 401-02, attached as Ex. B to the Lee Declaration, ECF No. 56.  Also effective during Plaintiff's April 2017 transport was Policy NPM 3-19, *Escorting Individuals in Care to and from Court Appearances*, ("NGRI Patient Court Transport Policy") which provides that NGRI patients requiring transport to court "will be transported by Department of Corrections (DOC) personnel."  Pl.'s SUMP ¶ 21; *see* NGRI Patient Court Transport Policy, attached as Ex. E to Lee Declaration, ECF No. 56.  During DOC transport, DOC used "full" restraints – handcuffs, leg irons, and belly chains - while transporting persons. Defs' SUMP ¶ 8.

Both Policy 401-02 and NPM 3-19 were superseded by DBH Policy 401.03, *General*

---

[2] Plaintiff was "found not guilty by reason of insanity on a charge of possession of a prohibited weapon [and] [o]n that same date, he also pled guilty to a charge of Manslaughter While Armed[.]" *See* Consent Order for Limited Conditional Release, ECF No. 9-1, at 2 (attached to Defendants' Motion to Dismiss, ECF No. 9).  Persons committed to St. Elizabeths after a finding of NGRI are referred to as post-trial forensic patients.

*Transportation Procedures for Post-Trial Forensic Individuals in Care* (effective Mar. 31, 2021) ("DBH Transport Policy") (attached as Defendants' Ex. 3, ECF No. 60-3).  Defs' SUMF ¶ 12.  That policy provides that Class A forensic patients will continue to be transported by DOC staff to and from court proceedings and external appointments, while in restraints, while forensic patients Class B and higher who have been determined to be at low risk or harm or elopement will be transported by Hospital staff, without using restraints.  DBH Policy, 401.03, Section III (B).  Forensic patients Class B and higher who have been determined to be at high risk for harm or elopement will be temporarily classified as Class A and subject to transport in the same manner as Class A forensic patients.  *Id.* Within 48 hours prior to a medical or community-services appointment, the patient's treatment team will conduct a clinical risk assessment to evaluate the individual's risk of harm to self or others and risk of elopement, and the same will be done within 72 hours of a scheduled in-court hearing.  DBH Policy 401.03, Section IV (A) (2); (IV) (B)(2).

## II. Legal Standard
### A. Federal Rule of Civil Procedure 12(b)(1)

Pursuant to Fed. R. Civ. P. 12(b)(1), "courts must dismiss any claim over which they lack subject matter jurisdiction." *Pub. Employees for Environmental Responsibility v. Nat'l Park Serv.*, Civil Action No. 19-3629, 2021 WL 1198047, *5 (D.D.C. Mar. 30, 2021) (*PEER*) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506-507 (2006)).  "Such a  motion can be raised 'at any time' during the litigation," *id.* (quoting Fed. R. Civ. P. 12(h)(3)), and "in deciding a 12(b)(1) motion, a court need not limit itself to the complaint; rather, it 'may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction in the case,'" *Toth v. Wells Fargo Bank, N.A.,* 82 F. Supp. 3d 373, 376 (D.D.C. 2015) (citations omitted).  "A motion to dismiss for mootness is properly brought under Rule 12(b)(1) because mootness itself deprives the court of jurisdiction." *Indian River Cty. v. Rogoff*, 254 F. Supp. 3d 15, 18 (D.D.C. 2017).

### B. Federal Rule of Civil Procedure 56

Summary judgment is appropriate if the movant carries the burden of showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," based upon the pleadings, depositions, and affidavits, and other factual materials in the record. Fed. R. Civ. P. 56(a); *Ali v. Tolbert*, 636 F.3d 622, 628 (D.C. Cir.2011); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material"fact. Fed. R. Civ. P. 56(a). Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant fact; the dispute must be "genuine," meaning the nonmoving party must establish more than "[t]he mere scintilla of evidence" in support of its position, *Anderson*, 477 U.S. at 252, "must do more than simply show that there is some metaphysical doubt as to the material facts," *Scott v. Harris*, 550 U.S. 373, 380 (2007), and cannot rely on "mere allegations" or conclusory statements, *see Estate of Parsons v. Palestinian Authority*, 651 F. 3d 118, 123 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150 (D.C. Cir. 1993).

The nonmoving party must present specific facts "'such that a reasonable jury could return a verdict for the nonmoving party.'" *Grosdidier v. Broadcasting Bd. of Governors, Chairman*, 709 F.3d 19, 23 (D.C. Cir. 2013) (quoting *Anderson*, 477 U.S. at 248); s*ee also* Fed. R. Civ. P. 56(c)(1). If the evidence proffered "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 6 (D.C. Cir. 2010). Furthermore, "[if] opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court

should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). The Court is only required to consider the materials explicitly cited by the parties, but may, on its own accord, consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009); *see also Sibert-Dean v. Wash. Metro. Transit Auth.*, 751 F. Supp. 2d 87, 90 (D.D.C. 2010) (requiring the non-moving party's factual representations made in an affidavit to be supported by facts in the record).  Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. When, at the summary judgment stage, the parties present a genuine dispute about the facts, the Court must draw all justifiable inferences in favor of the nonmoving party and accept the nonmoving party's evidence as true. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986);

*Evans v. Sebelius*, 716 F.3d 617, 619 (D.C. Cir. 2013).  If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate.  *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).

### III.  Analysis
### A. Overview of Arguments

Plaintiff asserts Fifth Amendment violations of his due process rights and requests declaratory and injunctive relief, *see generally* Complaint, ECF No. 1 (Counts II and III), and he makes a general request for an award of "compensatory damages" under the "Relief Requested" section of the Complaint.  *Id.*, ECF No. 1, at 24.[3]  Plaintiff alleges that the Defendants' use of restraints on involuntarily committed NGRI patients involved a substantial departure from the [medical or psychiatric] "professional judgment" standard set out in *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982).   Defendants contend however that *Youngberg* is not limited to *medical* or *psychiatric* judgment, and as such, Plaintiff fails to carry his burden of demonstrating a substantial departure from accepted *professional* judgment, practices, or standards.

Defendant argues further that because the policy regarding transport of patients and level of restraints, if any, that may be needed has been modified to require an individualized risk assessment, Plaintiff's claim for declaratory and injunctive relief is moot.  Plaintiff asserts however that relief remains available because Plaintiff asked also for compensatory damages in connection with his due process claims. This Court will address Defendants' mootness argument first before turning to the other arguments asserted by the parties.

### B. Plaintiff's Requests for Declaratory and Injunctive Relief are Moot

Plaintiff seeks declaratory and injunctive relief prohibiting the practice of having DOC

---

[3] Count I, which asserted a Fourth Amendment claim, was dismissed.  *See* March 27, 2019 Order, ECF No. 19.

transport forensic patients like him to and from court in full restraints without an individualized risk assessment. *See* Complaint, ECF No. 1, at 23-24. As noted previously, the Hospital has implemented a new policy that governs that exact situation challenged by Plaintiff, and accordingly, Defendants argue that because the "new policy's requirements [ ] entirely encompass the declaratory and injunctive relief plaintiff sought, . . . those claims should be dismissed as moot." Defs' Opp'n/Cross-Mot., ECF No. 60, at 12.

### 1. Determining Mootness

The mootness doctrine requires a federal court to refrain from deciding an issue "if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." Defs.' Opp'n, ECF No. 60, at 10; *see O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) (noting that "abstract injury is not enough," but rather, a plaintiff must allege that he "has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged statute or official conduct") (internal quotation marks and citations omitted); *see McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of Judicial Conference*, 264 F.3d 52, 55 (D.C. Cir. 2001) (recognizing requests for relief are moot when "events outrun the controversy such that the court can grant no meaningful relief.") This Article III case or controversy requirement applies "to declaratory judgments as it [does] to other forms of relief." *Conyers v. Reagan*, 765 F.2d 1124, 1127 (D.C. Cir. 1985). "Corrective action by an agency is one type of subsequent development that can moot a previously justiciable issue." *PEER*, 2021 WL 1198047 at *5 (quoting *NRDC v. United States Nuclear Reg. Comm'n*, 680 F.2d 810, 814 (D.C. Cir. 1982)); *see Worth v. Jackson*, 451 F.3d 854, 861 (D.C. Cir. 2006) ("[T]he Constitution nowhere licenses us to rule on the legality of an agency policy that no longer exists[.]") "The promulgation of a superseding policy or program can have the power to moot a challenge to the old one." *Citizens for Responsibility and Ethics in Washington v. Wheeler*

*(CREW)*, 352 F. Supp. 3d 1, 11 (D.D.C. 2019).

In his Reply, Plaintiff argues that before the burden shifts to Mr. Harris to show some exception to the mootness doctrine, Defendants must carry their "'initial heavy burden' of establishing that the case is moot," Pl.'s Reply, ECF No. 64, at 29 (citing *Atlas Brew Works, LLC v. Barr*, 391 F. Supp. 3d 6, 11 (D.D.C. 2019)).  A "defendant's voluntary cessation of a challenged practice" will moot a claim only if defendant shows (1) "there is no reasonable expectation . . . that the alleged violation will recur and (2) interim events have completely and irrevocably eradicated the effects of the alleged violation." *Larsen v. United States Navy*, 525 F. 3d 1, 4 (D.C. Cir. 2008) (internal quotation marks and citation omitted).

 Plaintiff alleges that Defendants' claim of mootness fails because (1) relief remains available to Plaintiff in the form of compensatory damages;[4] (2) there are "potential constitutional issues with the New Policy, and Plaintiff should have the opportunity to further examine the policy and intentions behind it before taking Defendants' word that the change resolved all issues;" *see* Pl's Reply, ECF No. 64, at 29; and (3) there are "still declaratory and injunctive remedies available to the Court and to Plaintiff, in the event that he is readmitted and classified as Class A for transportation purposes after being assessed as posing a 'high risk of harm or elopement.'" *Id.* at 30.  Plaintiff argues further that because this case involves Defendants' "voluntary cessation of a challenged practice," the standard for establishing mootness is more "stringent" and requires that "subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Pl's Reply, ECF No. 64, at 31-32 (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc*., 528 U.S. 167, 170 (2000)).

Defendants point to the mootness standard set forth in *Committee in Solidarity with People*

---

[4] The alleged availability of compensatory damages will be addressed separately herein.

*of El Salvador (CISPES) v. Sessions*, where the United States Court of Appeals for the District of

Columbia Circuit ("D.C. Circuit") found that:

> In injunction suits, plaintiffs usually must establish that the allegedly illegal actions of
> the past are causing or threatening to cause them present injuries.  Current or future harm
> serves to keep the controversy alive.  If the possibility of continuing injury disappears
> while the lawsuit is pending, the complaint ordinarily should be dismissed as moot.

929 F.2d 742, 744 (D.C. Cir. 1991) (internal citations omitted).  In the instant case, Defendants

changed the transport policy to require individualized determinations regarding the need for

restraints.  Accordingly, Plaintiff's claims for declaratory and injunctive relief regarding past

practices are moot unless Plaintiff can present "evidence indicating that the challenged [policy]

likely will be reenacted."  *Initiative & Referendum Inst. v. United States Postal Serv.*, 685 F.3d

1066, 1074 (D.C. Cir. 2012) (quotation omitted).

**2.  Plaintiff's Alleged Exception to Mootness Fails**

Plaintiff argues that the Pontes Declaration, ECF No. 60-1 (proffered by Defendants)

provides "insufficient detail regarding exactly [how] the New Policy will be implemented" and "no

assurance that the New Policy will be maintained in the future," and accordingly, it is not

"absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."

Pl.'s Reply, ECF No. 64, at 34.[5]  Plaintiff relies on *People for the Ethical Treatment of Animals v.*

*U.S. Dep't of Agric. & Animal & Plant Health Inspect. Serv.* ("*PETA*"), a Freedom of Information

Act case, where the United States Department of Agriculture ("USDA") removed certain records

from its website that were reposted after PETA filed suit, and the USDA asserted that the removal

had been "temporary" and "one-time."  *PETA*, 918 F.3d 151, at 153, 158 (D.C. Cir. 2019).  During

litigation, the USDA issued a letter outlining its progress and approach in reposting materials and

---

[5] Martha Pontes is the Chief Nurse Executive at St. Elizabeths Hospital for the District of Columbia
Department of Behavioral Health.  Pontes Decl., ECF No 60-1, ¶ 2.

stating its plans about future postings, *id.* at 154.  The D.C. Circuit reversed the district court's finding of mootness for two types of documents on grounds that there was "not enough clarity fully to assess the agency's intentions with respect to future posting," and furthermore, the letter did not "express the agency's position clearly enough" to convince the Circuit Court that it was "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Id.* at 153, 157.

Defendants note that, in *PETA,* the D.C. Circuit stated that if the government proffered a declaration resolving some ambiguous statements,  PETA's claims would be mooted especially because of the "presumption of legitimacy accorded to the Government's official conduct . . ."  *Id.* at 158 (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004)).  The D.C. Circuit noted further that the kind of government commitments that courts credit with establishing mootness include promulgation of a "new permanent policy" and "formally announced changes to official government policy."  *Id.* at 159 (citations and quotations omitted).  Defendants contend that these kinds of commitments are evident in the instant case.  Defs.' Reply, ECF No. 70, at 4; *see* DBH Transport Policy; Pontes' Decl. (explaining the way in which the Policy operates).[6]

Plaintiff surmises that because Defendants have not "concede[d] the error of their past practices with respect to the use of restraints," this "lends credence to the prospect of Defendants

---

[6] Plaintiff focuses an extraordinary amount of attention on the underpinnings of the Circuit Court's assessment of the likelihood of recurrence of the challenged activity in *PETA,* 918 F.3d at 158-159 – including factors such as the "seemingly unproblematic rationale" for the removal of information, the one-time and temporary nature of the takedown from the website, and the absence of bad faith in litigation - but those factors are not directly applicable to the instant case.  The *PETA* case involved an occurrence of information being taken down from a USDA website, in the context of a FOIA action, while this case involves a change in policy involving transport of persons from the Hospital to court appearances, where the DBH Transport Policy, which is set out in significant detail, totally replaces the previous policy.  Plaintiff asserts that the Defendants' timing of the DBH Transport Policy is suspect and evidence of a bad faith litigation tactic, but the Court finds this argument unwarranted and unpersuasive.

reverting to (or continuing) their unconstitutional behavior." Pl.'s Reply, ECF No. 64, at 39.

Plaintiff's unsupported assumption ignores that there is "well-settled case law . . . requir[ing] a court

to presume that government officials will conduct themselves properly and in good faith. . . . " *In*

*re Navy Chaplaincy*, 850 F. Supp. 2d 86, 94 (D.D.C. 2012); *see Committee in Solidarity with People*

*of El Salvador ("CISPES") v. Sessions*, 929 F.2d 742, 744 (D.C. Cir. 1991) (It is "the settled

practice" to rely on representations by government officials in voluntary cessation analyses.) (citing

*DeFuntis v. Odegaard*, 416 U.S. 312, 317 (1974) and *Ehlert v. United States*, 402 U.S. 99, 107

(1971)). Furthermore, Plaintiff proffers nothing more than speculation that the New Policy might

not "actually prevent violations of his constitutional rights in the future . . . " if Plaintiff is again

committed to the Hospital. Pl.'s Reply, ECF No. 64, at 34. But, "the mere power to reenact a

challenged [policy] is not a sufficient basis on which a court can conclude that a reasonable

expectation of recurrence exists. Rather, there must be evidence indicating that the challenged

[policy] likely will be reenacted." *Larsen v. United States Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008)

(alteration in original) (quoting *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349

(D.C. Cir. 1997)); *see also Daskalea v. Wash. Humane Society*, 710 F. Supp. 2d 32, 40 (D.D.C.

2010) (Kollar-Kotelly, J.) (finding no live controversy where the prior version of a statute was "no

longer in force" and there was no allegation that the prior version "continued to have any residual

effect"). In this case, Plaintiffs proffer no persuasive evidence that the challenged policy will likely

be reenacted.

  Accordingly, upon consideration of the arguments presented by the parties and the caselaw

cited in support thereof, this Court finds that Defendants have established that Plaintiff's claims for

declaratory and injunctive relief are moot, and this Court is without jurisdiction over such claims.

Defendants changed the transport policy challenged by Plaintiff, and the DBH Transport Policy

requires individualized assessments as to whether restraints are necessary when transporting

forensic patients who are committed after being found NGRI.  Plaintiff provides no evidence that

Defendants will revert to the previous policy, and therefore, no exception to mootness applies.  The

Court turns now to Plaintiff's due process claims for which Plaintiff seeks compensatory relief.

### C.  Plaintiff's Due Process Claims
### 1. Due Process Standards under *Youngberg*  and *Bell*

The Supreme Court has recognized that "[l]iberty from bodily restraint" is at "the core of

the liberty protected by the Due Process Clause from arbitrary governmental action;" *Youngberg v.*

*Romeo*, 457 U.S. at 316 (internal quotation marks and citation omitted).  In *Youngberg*, the question

presented to the Supreme Court was "whether respondent, involuntarily committed to a state

institution for the mentally [handicapped], has substantive rights under the Due Process Clause of

the Fourteenth Amendment to (i) safe conditions of confinement; (ii) freedom from bodily

restraints; and (iii) training or 'habilitation.'"  *Youngberg*, 457 U.S. at 309.  The Supreme Court

determined that the respondent's liberty interests had to be balanced against relevant state interests,

*id.* at 321, before proceeding to analyze the relevant standard for such balancing.

Pursuant to the *Youngberg* standard, the government "may not restrain" patients

involuntarily committed to a state mental facility "except when and to the extent professional

judgment deems this necessary to assure [their] safety or to provide needed training."  *Id.* at 324.

To demonstrate that the government failed to exercise professional judgment under *Youngberg*, the

involuntarily committed person must show more than "simple negligence" on "the part of the State,"

but "need not show deliberate indifference to prevail."  *Costa v. Bazron*, 464 F. Supp. 3d 132, 141

(D.D.C. 2020) (internal quotation marks and citation omitted) ("*Costa III*").  Plaintiff asserts that

the "professional judgment" standard set forth in *Youngberg* is the "proper balance between the

legitimate interests of the State and the rights of the involuntarily committed to reasonable

conditions of safety and freedom from unreasonable restraints."  Plaintiff's Reply, ECF No. 64, at

12 (citing *Youngberg*, 457 U.S. at 321).

Defendants note that "the precise standard to apply when assessing a civilly committed individual's substantive due process claim is not firmly established," Defs.' Opp'n, ECF No. 60, at 14 (citing *Jordan v. District of Columbia*, 161 F. Supp. 3d 45, 57 (D.D.C. 2016)). Accordingly, Defendants address both the *Youngberg* "professional judgment" standard and the "non-punitive" standard articulated in *Bell v. Wolfish*, 441 U.S. 520 (1979). In determining whether there is a substantive due process violation under *Bell*, courts must decide "whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538. If the disability [restraint, in this case] is "reasonably related to a legitimate government objective,  it does not, without more, amount to punishment." *Id.* at 539 (internal quotation marks omitted). In *Bell*, "[p]rison administrators [were] accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment [were] needed to preserve internal order and discipline and to maintain institutional security" when evaluating the application of restraints during confinement. *Id.* at 547 (citations omitted). Such considerations were found to be "within the province and professional expertise of corrections officials," and accordingly, courts should "ordinarily defer to their expert judgment in such matters." *Id.* at 547-48.

Plaintiff argues that Defendants' reliance on the *Bell* standard is misplaced because that case dealt with a class action by pretrial detainees who alleged that certain "conditions of confinement and practices" in the "short-term custodial facility" violated their due process. Pl's Reply, ECF No. 64, at 14 (citing *Bell*, 441 U.S. at 523). Defendants reject this "narrow application" of *Bell*, opining instead that *Bell's* non-punitive standard  has been "broadly applied not only to evaluate conditions of confinement of pretrial detainees but also to individuals who are involuntarily civilly committed and civilly detained." Defs' Reply, ECF No. 70, at 6, *see*, *e.g., Guillory v. Louisiana Dep't of*

*Health and Hospitals*, Civil Action No. 16-787, 2018 WL 1404277, at *7-8 (M.D. La. Mar. 20, 2018) (applying the subjective "deliberate indifference standard to measure episodic acts and omissions" in this case involving an individual – who was committed after being found not guilty by reason of insanity – who asserted claims of failure to supervise, inadequate medical care, and failure to protect);[7] *In re Bahadur*, 441 F. Supp.3d 467, 477 (W.D. Tex, 2020) (rejecting *Youngberg* in favor of *Bell* as a standard to apply to claims of a civil immigration detainee in a case involving administering involuntary medical care).  In *Bahadur*, the court found that "respondent's status as a civil immigration detainee lies in between a mentally disabled individual involuntarily committed to a state institution, as in *Youngberg*, and a criminal defendant serving a prison sentence, as in *Turner* [and] [t]o that end, the Court is of the view that the Supreme Court's test from *Bell* is the correct standard because Respondent's status as a civil immigration detainee awaiting the resolution of his removal proceedings is more akin to that of a pretrial detainee awaiting trial."[8]  *In re Bahadur*, 441 F. Supp. 3d at 477.

Defendants assert that courts have considered (and rejected) constitutional challenges to the use of restraints in the transport of civilly committed forensic patients from a psychiatric facility under both standards.  Defs.' Opp'n, ECF No. 60, at 17-18; *see, e.g., Balkum v. Sawyer*, Civil Action No. 06-1467, 2011 WL 5041206, at *9-10 (N.D.N.Y. Oct. 21, 2011) (rejecting claim by involuntarily committed patient [who had been convicted on sexual offenses prior to his

---

[7] The *Guillory* court relied heavily on *Hare v. City of Corinth, MS*, 74 F.3d 633 (5th Cir. 1996), where the court "drew a distinction between constitutional challenges to conditions, practices, rules, or restrictions on the one hand, and episodic acts or omissions on the other."  74 F. 3d at 644 (internal quotation marks omitted).  The court found that "[i]f the challenge is to a condition of confinement, the level of scrutiny is rationality and the test is whether a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective . . . [and thus]. . . does not, without more, amount to punishment."  *Id.* at 640 (internal quotation marks and quotation to *Bell* omitted).

[8] *Turner* refers to *Turner v. Safley*, 482 U.S. 78 (1987).

commitment] that use of full restraints during transport outside a state psychiatric facility for medical trips violated due process under *Youngberg's* professional judgment standard).  In *Balkum*, the court determined that the facility's "use of restraints [in the form of handcuffs, waist chains and leg shackles] to prevent escapes and ensure the safety of others [was] presumptively valid."  2011 WL 5041206 at *10.  The court there relied upon the professional judgment of the facility's Chief Safety Officer, who was "competent by virtue of his experience to make safety-related decisions" and who indicated that the "application of physical restraints is a necessary and appropriate means to ensure the safe transport of SOTP [sex offender treatment program] residents."  *Id.* (citing the Affidavit of the Chief Safety Officer); *cf. Thielman v. Leean*, 140 F. Supp. 2d 982, 992 (W.D. Wisc. 2001) (finding policy requiring transport of all civilly committed sexually violent persons in full restraints was a reasonable exercise of "professional judgment" under both *Youngberg* and is not "tantamount to punishment" under *Bell*), *aff'd* 282 F.3d 478 (7th Cir. 2002)).

In *Thielman*, the court noted that while the parties had analyzed the transportation policy under *Youngberg's* professional judgment standard, that "test [did] not apply perfectly to a situation such as this in which the plaintiff [was] challenging an across-the-board policy rather than an individual decision regarding the use of restraints" because such a "blanket" policy "*remove[d]* the need for decisionmaking on a case-by-case basis."  *Thielman*, 140 F. Supp. 2d at 991.  The court found that the *Bell* test "may offer a better method for assessing the constitutionality of the . . . transport policy," which involved determining whether the restrictions imposed "amount[ed] to punishment, or otherwise violate the Constitution."  *Id.*   In applying *Bell*, the court had to "decide whether the disability [was] imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose."  *Id.* (internal quotation marks and citation omitted).  "[T]hat determination generally will turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in

16

relation to the alternative purpose assigned to it."   *Id.* (internal quotation marks and citation omitted).

In *Thielman*, the court determined that the institution's policy of placing patients – who were committed involuntarily as sexually violent persons – in full restraints during transportation did not violate their due process.   The *Thielman* court decided ultimately that "whether one applies *Youngberg's* professional judgment standard or *Bell's* punitive versus non-punitive distinction, the outcome is the same [because] [u]nder either approach, the court must defer to the professional expertise of the institution's administrators when evaluating the relationship between the challenged condition and the government's interest."   *Id.* at 991.   In contrast, Plaintiff asserts that *Youngberg* and *Bell "*articulate different constitutional standards" based upon "different state interests."   Pl.'s Reply, ECF No. 64, at 14-15.   Plaintiff surmises that:

> [U]nder *Bell*, the state's interest in restraints arises from its need to maintain "internal security" when the state confines a pre-trial detainee [ ], while under *Youngberg*, the state's interest in restraints arises from its need to maintain a mental health services program for involuntarily committed patients [ ].   *Bell* rightfully provides a level of deference to prison administrators in determining policies for the former [ ], and *Youngberg* rightfully provides a level of deference to medical professionals in determining policies for the latter [ ].

Pl.'s Reply, ECF No. 64, at 15.

Plaintiff's distinction is based on faulty logic.   First, Plaintiff's view of the inapposite state interests in these two cases – maintaining internal security versus maintaining a mental health services program – is not wholly consistent with *Youngberg*, where the state's duty was noted to be the provision of "food, shelter, clothing and medical care," as well as "reasonable safety for all residents and personnel within the institution" and "such training [as is] . . .  reasonable to ensure [residents'] safety and to facilitate [residents'] ability to function free from bodily restraints."   *Youngberg*, 457 U.S. at 324.   Certainly, safety and security were considerations in both *Bell* and *Youngberg*.  *See Youngberg*, 457 U.S. at 320 ("In operating an institution such as Pennhurst, there

are occasions in which it is necessary for the State to restrain the movement of residents – for example, to protect them as well as others from violence.  Similar restraints may also be appropriate in a training program.")

Second, contrary to Plaintiff's assertions, *Youngberg's* professional judgment standard is not limited to a "qualified medical professional."  Pl.'s Mot., ECF No. 55, at 13 (emphasis in original).  In *Youngberg*, the Supreme Court discussed the respondent's entitlement to minimally adequate training that was "reasonable in light of [his] liberty interests in safety and freedom from unreasonable restraints."  *Youngberg*, 457 U.S. at 322.  The Supreme Court explained that courts should "show deference to the judgment exercised by a qualified professional" and accordingly, "th[at] decision, if made by a professional, is presumptively valid" and liability may be imposed only "when the decision is such a substantial departure from accepted professional judgment, practice, or standards . . ."  *Id.* at 322-323; *see* n.30 ("By "professional" decisionmaker, we mean a person competent, whether by education, training or experience, to make the particular decision at issue.")  In that footnote, the Supreme Court distinguished between "[l]ong-term treatment decisions," which are normally made by "persons with degrees in medicine and nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the [mentally handicapped]" versus "day-to-day decisions" regarding care, "including decisions that must be made without delay" which will often be made by "employees without formal training but who are subject to the supervision of qualified persons."  *Id.*

Defendants contend that this Court "need not determine which standard is applicable because the Court's inquiry is the same under either approach."  Def.'s Opp'n, ECF No. 60, at 16.  "Under both *Bell* and *Youngberg*, 'the court must defer to the professional expertise of the institution's administrators when evaluating the relationship between the challenged condition and the government's interest.'"  Defs' Opp'n, ECF No. 60, at 16-17 (citing *Thielman*, 140 F. Supp. 2d

at 991 (comparing the two standards)).   This Court finds *Thielman* instructive and agrees that both the *Youngberg* and *Bell* standards involve deference to the professional expertise of the institution's administrators.   Accordingly, this Court will turn to whether the Defendants herein exercised professional judgment.

### 2. Defendants' Exercise of Professional Judgment

 Defendants assert that DBH's practice of having DOC transport post-trial forensic patients to court appearances and DOC's use of restraints during transport was an exercise of professional judgment.   Defs' Opp'n, ECF No. 60, at 19, 22.   Pursuant to *Youngberg*, a "decision, if made by a professional, is presumptively valid." *Youngberg*, 457 U.S. at 323 (noting that there "is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions").   *In Battista v. Clarke*, the United States Court of Appeals for the First Circuit noted that the tests set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994) and *Youngberg* "leave ample room for professional judgment, constraints presented by the institutional setting, and the need to give latitude to administrators who have to make difficult trade-offs as to risks and resources." *Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011).[9]   This may include balancing psychiatric and medical needs with "security considerations [ ] at prisons or civil counterparts [because] administrators have to balance conflicting demands."   *Battista*, *id.* at 454.   Accordingly, it is "not appropriate for the courts to specify which of several professionally acceptable choices should have

---

[9] Plaintiff notes that the language in *Battista* "merely refers to the balancing that a medical professional administering a mental health services program must make between medical ideals and the practicalities of maintaining the security and administration of a mental health services program." Pl.'s Reply to Mot. to Exclude, ECF No. 65, at 12 (citing *Battista*, 645 F.3d at 455). That case involved a civil detainee with gender identity disorder who brought an action against Massachusetts officials for "deliberate indifference" to her medical needs.   The Circuit Court concluded ultimately that "there [was] enough in this record to support the district court's conclusion that 'deliberate indifference' has been established – or an unreasonable professional judgment exercised," even if there was no bad motive or intent to do harm.   *Id.*

been made." *Youngberg*, 457 U.S. at 321 (internal quotation marks and citation omitted).

At the same time, "the court must 'make certain that professional judgment in fact was exercised.'" *Costa v. Bazron*, 464 F. Supp. 3d 132, 141 (D.D.C. 2020) (*Costa III*) (quoting *Youngberg*, 457 U.S. at 321).[10] Plaintiff proffers that if there is no evidence that a <u>medical</u> professional made or supervised the decision, such decision is not "presumptively valid" under [Plaintiff's reading of] *Youngberg*. Pl.'s Mot., ECF No. 55, at 14 (emphasis added); *see Costa v. Bazron*, 456 F. Supp. 3d 126, 135 (D.D.C. 2020) (*Costa I*), (where the court found that although there was "evidence in the record" that the Hospital's COVID-19 response was overseen by medical professionals, it was "unclear" whether the response policies were "presumptively valid" because the "person or persons who have decided to implement these policies [had not been identified], and so the Court [could] not say with any certainty that they satisfy the definition of 'professional' articulated in *Youngberg*.")

In contrast, in the instant case, Defendants explain that "the policy at issue [regarding transport by DOC] was approved and signed by the Chief Nurse Executive at the time, Clotilde Vidoni-Clark, RN, PhD." Defs' Opp'n, ECF No. 60, at 19; *see* Pl.'s Ex. E (NGRI Patient Court Transport Policy), at 4.[11] Accordingly, Plaintiff's reliance on the *Costa* cases is misplaced because the policy in this case was clearly approved internally. Furthermore, *Costa* is factually distinguishable because that case pertained to conditions and guidelines at the Hospital considering the COVID-19 pandemic, whereas this case relates to transport outside the facility and procedures governing safety during such transport.

---

[10] In *Costa,* patients who were involuntarily civilly committed to St. Elizabeths alleged that the Hospital's response to the COVID-19 pandemic was constitutionally deficient.

[11] Defendants assert that "all DBH and St. Elizabeths' policies involving patient treatment and care are regularly reviewed and approved by clinical staff, including nurses, psychiatrist, psychologist, and senior management." Pontes Decl. ¶ 2.

In this case, the Court finds that DBH's practice of having DOC transport post-trial forensic patients to court appearances and the use of restraints during such transport was an exercise of professional judgment that is "presumptively valid." *Youngberg*, 457 U.S. at 323; *see Foster v. Phinney*, Civil Action No. 19-260, 2021 WL 1321346, at *8 (D. Minn. Mar. 5, 2021) (noting that the constitutional rights of a civilly committed person "can be subject to reasonable limitation or retraction based on security concerns"). While Plaintiff may argue that an "institution could address its security concerns with a more tailored policy, [ ] that is not the test" for whether the policy is a proper exercise of professional judgment. *Beaulieu v. Ludeman*, 690 F.3d 1017, 1032 (8th Cir. 2012). In *Beaulieu*, the Eighth Circuit found that the use of full restraints for patients civilly committed as sexual offenders, without any "individualized determination of risk in determining whether to apply the restraints to a particular patient," *id.* at 1031, was a proper exercise of professional judgment. *Id.* at 1033; *see also Osolinski v. Correctional Officer Assigned*, Civil Action No. 15-01884-DAD-MJS, 2016 WL 6298516, *3 (E.D. Cal. Oct. 26, 2016) (dismissing a claim challenging the use of correctional officers (not hospital employees) to transport civil detainees in full restraints and noting that "[p]laintiff has not alleged facts to indicate that the conditions of his transport were punitive or unduly restrictive in relation to his status, nor has he alleged facts to suggest that Defendants' professional judgment was improperly exercised.")

In support of their claim that the restraint policy involved consideration of safety and security concerns, Defendants proffer the Declaration of John M. Armstrong, Commander for the Court Transport Unit and the Central Cell Block of the District of Columbia Department of Corrections ("DOC"). Def.'s Ex. 2, ECF No. 60-2, ¶ 2; ¶ 4 (discussing the development of DOC's policies on restraints and indicating that DOC correctional officers undergo training concerning the use of restraints); ¶ 5 (discussing the restraints that are used and noting the purpose of the restraints is for "safety and protection of DOC staff, others being transported, and the public, and to prevent

escape").

Plaintiff contends however that "[e]ven if the decision [to use restraints] is entitled to a presumption of validity because it was made or supervised by a medical professional [here, approved by the Chief Nurse Executive] the Court must still review that decision to determine whether that decision 'substantially depart[s] from accepted professional standards.'" Pl.'s Mot., ECF No. 55, at 15 (quoting *Costa I*, 456 F. Supp. 3d at 135).   "[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323.   In that regard, "expert testimony may be relevant for determining whether an agency's decision substantially departs from the requisite [accepted] professional judgment."  *LaShawn A. v. Dixon*, 762 F. Supp. 959, 995 (D.D.C. 1991) (citation omitted), *aff'd and remanded sub nom. LaShawn A. by Moore v. Kelly*, 990 F.2d 1319 (D.C. Cir. 1993).

In connection with the underlying Motion for Summary Judgment, Plaintiff has moved to exclude the report and testimony of Defendants' expert, who is proffered for purposes of validating that the policy of restraining persons being transported is consistent with accepted professional judgment.  The Court, having found that the decision to restrain, which is based on safety and security concerns, is entitled to a presumption of validity, now shifts its focus to Plaintiff's challenges regarding Defendants' expert.

### 3. Exclusion of Defendants' Expert
### a. Legal Standard

Fed. Rule of Evidence 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  When considering the admissibility of expert testimony, courts assume a "gatekeeping role" to ensure "the methodology underlying an expert's testimony is valid and the expert's conclusions are based on 'good grounds.'" *Chesapeake Climate Action Network v. Exp.-Import Bank of the United States*, 78 F. Supp. 3d 208, 219 (D.D.C. 2015) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 600 (1993)).  Trial courts must find, by a preponderance of the evidence, that the expert is qualified and further, that the expert's testimony is reliable and relevant.  *Daubert*, 509 U.S. at 589; *see* Federal Rule of Evidence 104(a).

To qualify as an expert witness, the "degree of 'knowledge, skill, experience, training or education' required" . . . 'is only that necessary to [e]nsure that the witness's testimony "assist" the trier of fact.'" *United States ex rel. Morsell v. Symantec Corp.*, Civil Action No. 12-800 (RC), 2020 WL 1508904, at *3 (D.D.C. Mar. 30, 2020) (quoting *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981).  An expert may obtain professional judgment through long experience in a particular field.  *Heller v. District of Columbia*, 801 F.3d 264, 271 (D.C. Cir. 2015) ("*Heller III*"), *affirming in relevant part Heller v. D.C.*, 952 F. Supp. 2d 133, 142 (D.D.C. 2013)).  Regarding experts relying primarily on their experience, they "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Heller III*, 801 F. 3d at 272 (quoting Rule 702 advisory committee note (2000)).  For such experts, their reports must "specifically identif[y] [ ] experience as being the basis for the opinions proffered, and . . . provide[ ] some justification — in the form of information gained from the expert's relevant experience — for those opinions." *Heller III*, 801 F.3d at 271 (citation omitted).

**b. Mr. Gravette is Qualified, and his Opinion is Admissible**

In this case, Plaintiff challenges DBH's prior practice of using DOC staff and vehicles to transport Mr. Harris to and from court, and DOC's use of restraints during that transport. Pl.'s Mot. to Exclude, ECF No. 57, at 6. Courts may impose liability only where "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 321, 323; *see Jordan v. District of Columbia*, 161 F. Supp. 3d 45, 56 (D.D.C. 2016) (same). And in that regard, "expert testimony may be relevant for determining whether an agency's decisions substantially depart from the requisite professional judgment." *LaShawn A. v. Dixon*, 762 F. Supp. at 995 (citing *Youngberg*, 457 U.S. at 323, n. 31).

Plaintiff has proffered Tobias D. Wasser, M.D., as his expert witness to opine on the appropriateness of the use of restraints during Plaintiff's transport (focusing on this issue from a medical perspective) while Defendants have proffered Mr. Roy T. Gravette ("Tim Gravette"), a twenty-year corrections veteran with the Bureau of Prisons ("BOP") (focusing on this issue from a safety/security perspective). *See* Pl.'s Mot. to Exclude, ECF No. 57, Ex. A [Wasser Report] and Ex. B [Gravette Report].

Plaintiff challenges Defendant's expert on three grounds: (1) Defendants' expert is not qualified to opine on the appropriateness of the use of restraints on Plaintiff during transport because he is not a "qualified medical or psychiatric expert" [Pl.'s Mot. to Exclude, ECF No. 57, at 11-16] and (2) as such, Mr. Gravette's testimony is not relevant to whether the NGRI Patient Court Transport Policy accords with the professional judgment of a medical or psychiatric professional [Pl.'s Mot. to Exclude, ECF No. 57, at 16-18]; and furthermore, (3) Mr. Gravette's report and testimony are unreliable because they fail to explain why the correctional standards identified by him are applicable to transporting NGRI patients. Pl.'s Mot. to Exclude, ECF No. 57 at 19-20.

Plaintiff argues first that Mr. Gravette is not qualified to opine on whether the NGRI Patient Court Transport Policy substantially departs from professional judgment because he "lacks any medical or psychiatric qualifications or experience[.]" Pl.'s Mot. to Exclude, ECF No. 57, at 13. This argument rests however on the premise that professional judgment on this issue – the DOC's application of restraints during transport – needs to be medical or psychiatric professional judgment as opposed to penological professional judgment. In contrast, Defendants argue that "[n]othing in the Constitution mechanically gives controlling weight to one set of professional judgments" over another. Defs.' Opp'n to Mot. to Exclude, ECF No. 62, at 6 (citing *Battista v. Clarke*, 645 F.3d 449, 455 (1st Cir. 1993)). Moreover, the premise of Plaintiff's argument in favor of professional judgment that is exclusively medical or psychiatric is based on a misreading of *Youngberg*.[12] The *Youngberg* court noted that "professional" decisionmakers are "persons competent, whether by education, training or experience to make the particular decision at issue." *Youngberg*, 457 U.S. at 323, n. 30. Furthermore, that "decision, if made by a professional, is presumptively valid[.]" *Id.* at 323. Accordingly, as the transport policy involving the use of restraints was based on a professional judgment that incorporates the need for safety and security for patients and DOC staff, Mr. Gravette with his "two decades of wide-ranging correctional experience, including considerable experience in the transportation of detainees," *see* Defs.' Opp'n to Mot. to Exclude, ECF No. 62 at 4, has the

---

[12] This Court notes also that Plaintiff's Reply to Mot. to Exclude, ECF No. 65, at 11-13, focuses more perhaps on the general use of restraints on NGRI patients in a facility versus restraints applied during transport. Defendants note that "during transport, the restraint of patients is not used for punishment or treatment, but rather for security purposes[.]" Defs.' Opp'n, ECF No. 60, at 20. *See* Pl.'s Reply to Mot. to Exclude, at 12 ("Under Defendants' interpretation, if the District were to transfer the entire operation of its mental health services program from DBH to DOC, it could restrain all involuntarily committed patients under a 'correctional' standard rather than a "medical psychiatric" one by virtue of the fact that the institution running the program is called the 'Department of Corrections.'") This generalization by Plaintiff ignores the distinction made in *Youngberg* between those persons competent to make long-term treatment decisions versus those making day-to-day type decisions. *Youngberg,* 457 U.S. at 323, n. 30.

25

necessary expertise to opine on the professional judgment exercised.   Therefore, Plaintiff's argument to exclude Mr. Gravette on alleged grounds that he is unqualified to opine on the appropriateness of the use of restraints during transport fails.

Plaintiff argues next that "[e]ven assuming that it is relevant for Mr. Gravette to testify why "[t]he District's use of restraints to transport [Mr.] Harris was well within the standards of accepted professional penological judgment" as opposed to a medical judgment, . . ., his testimony is still inadmissible as it fails to meet Rule 702's reliability standards."  Pl.'s Mot. to Exclude, ECF No. 57, at 19.  Plaintiff asserts that the expert needs to "identify specific and objective standards, not rely on his personal opinions about what professional standards should be." *Id.* (citing *Parsi v. Daioleslam*, 852 F. Supp. 2d 82, 89 (D.D.C. 2012) (citation omitted)).  But Mr. Gravette <u>does</u> identify professional standards such as those applied by "the United States Marshals Service,  the United States Immigration and Customs Enforcement Agency, the Federal Bureau of Prisons, United States Customs and Border Patrol, the Boulder Colorado Sheriff's Office, and the Chenango County Sheriff's Office[.]"  Defs.' Opp'n to Mot. to Exclude, ECF No. 62, at 5 (emphasis added).

More specifically, Plaintiff alleges that Mr. Gravette "fails to explain why any of his identified standards, which describe the use of restraints by correctional and law enforcement officials against individuals suspected of or found to have violated the law, <u>should also be applied to NGRI patients</u> who are not suspected of committing a criminal offense – and indeed, are instead specifically  acquitted . . . on the ground that [they were] insane at the time of [the offense's commission."  Pl.'s Mot. to Exclude, ECF No. 57, at 19-20 (internal citations omitted) (emphasis added); *see also* Pl.'s Reply, ECF No. 64, at 18 (where Plaintiff attempts to discredit Defendants' reliance on cases such as *Thielman*, which involve the transport of sexual offenders as opposed to

"involuntarily committed patients" insofar as sex offenders pose a greater safety risk).[13]  But, "[t]he fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness." *Jones v. United States*, 463 U.S. 354, 355 (1983); *see also Warren v. Harvey*, 632 F.2d 925, 931 (2d Cir. 1980) ("Insanity acquittees thus have 'proved' themselves a danger to society at one time.")

Defendants assert that "since well before Home Rule, District law required persons like plaintiff – those found NGRI – to be presumed dangerous, until found otherwise by a judge.  Defs.' Opp'n, ECF No. 60, at 21; *see United States v. Jackson*, 553 F.2d 109, 115 (D.C. Cir. 1976) (discussing the legislative history of Pub. L. No. 313, 69 Stat. 610 (Aug. 9, 1955)).  "The D.C. Code . . . creates a presumption of dangerousness that remains for the duration of [the patient's] mandated confinement at St. Elizabeths" and  "St. Elizabeths is obligated to treat these patients as dangerous until a court determines otherwise."  *White v. United States*, 780 F.2d 97, 103, 104 (D.C. Cir. 1986). Patients who have been committed after being adjudged NGRI "constitute a special class that should be treated differently from other candidates for commitment."  Defs.' Opp'n, ECF No. 60, at 20-21 (citing *Jones v. United States*, 463 U.S. 354, 370 (1983)) (footnote omitted); *see United States v. Ecker*, 543 F.2d 178, 197 (D.C. Cir. 1976) (persons found NGRI "are treated differently from civil committees because they are an exceptional class of people who have already unhappily manifested the reality of anti-social conduct.") (citations and internal quotation marks omitted); *see Powell v. Florida*, 579 F.2d 324, 333 (5th Cir. 1978) (agreeing with the court in *Ecker*, 543 F2d at 197, that "prior antisocial conduct of an insanity acquittee justifies treating such a person differently . . . ")

Defendants argue further that while Plaintiffs challenge Mr. Gravette's expertise because

---

[13] This Court notes that the NGRI Patient Court Transport Policy provides for transport by the DOC of individuals with the following legal classifications: "DC Examination; DC Mentally Incompetent; Not Guilty by Reason of Insanity DC; Not Guilty by Reason of Insanity US; Not Guilty by Reason of Insanity USVI; Dual Commitment; Sexual Psychopath."  Lee Decl., Ex. E.

"[his] conclusions are based on correctional rather than medical or psychiatric experience," any "'concerns about the conclusions [to which] . . . experts' experience led them . . . go to the weight of the testimony,' not its admissibility." Defs.' Opp'n to Mot. to Exclude, ECF No. 62, at 5 (quoting *Heller III*, 801 F.3d at 272) (quoting *Heller v. District of Columbia*, 952 F. Supp. 2d at 142)). In considering the admissibility of an expert's testimony, courts "must focus 'solely on principles and methodology, not on the conclusions that [the expert] generate[s].'" *United States v. Smith*, Civil Action No. 19-324 (BAH), 2020 WL 5995100, at *24 (D.D.C. Oct. 9, 2020) (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996) (quoting *Daubert*, 509 U.S. at 595)). Defendants submit that Mr. Gravette's "opinion regarding the penological and public safety aspects of detainee transportation to and from court [ ] aid[s] the Court's understanding of the other factors that the District considered during NGRI patient transport beyond the medical aspects." Defs.' Opp'n to Mot. to Exclude, ECF No. 62, at 5; Ex. B [Gravette Report], ECF No. 58-1 at 244-250. This Court finds that Mr. Gravette's opinion regarding the DOC policy to restrain persons who are NGRI while they are transported to court is relevant because the professional judgment underlying that policy involves overriding safety and security considerations.[14] Therefore, it is appropriate to consider the expertise of a person with correctional expertise as to whether that policy comports with accepted standards of professional judgment. Accordingly, Plaintiff's Motion to Exclude the Expert Report and Testimony of Mr. Tim Gravette shall be denied. The Court turns now to the ultimate issue of whether the policy is consistent with standards of professional judgment.

### 4. Defendants' Transport Policy and Use of Restraints Comports with Accepted Standards of Professional Judgment

After review of various inmate escort policies and procedures, Mr. Gravette opined that

---

[14] Plaintiff's expert, Dr. Tobias Wasser, focused solely on standards regarding medical professional judgment. *See generally* Lee Second Decl., ECF No. 58, Ex. A [Wassert Expert Report], ECF No. 58-1, at 1-18.

"[b]ased on [his] years of practical correctional experience and training[,] [he is] of the opinion the [DOC] was following the basic principles and techniques used in the restraint of Warren Harris when he was transported for a Court appearance on 04/05/2017".  Ex. B, ECF No. 58-1 at 245. Defendants acknowledge that "although psychiatric and medical needs are important, 'security considerations also matter at prisons or civil counterparts, and administrators have to balance conflicting demands.'"   Defs.' Opp'n, ECF No. 60, at 15 (citing *Battista*, 645 F.3d at 454); *see id.*, 645 F.3d at 455 ("Any professional judgment that *decides* an issue involving conditions of confinement must embrace security and administration, and not merely medical judgments.") (quoting *Cameron*, 990 F.2d at 20) (emphasis in original).  Even when a decision may cause harm, "so long as the balancing judgments are within the realm of reason and made in good faith, the officials' actions are not . . . beyond 'reasonable professional' limits." *Battista*, 645 F.3d at 454 (quoting *Youngberg*, 457 U.S. at 321, 324-25). In the instant case, there is no indication that the application of restraints caused Plaintiff any tangible physical harm.  Rather, Mr. Harris alleges that "the placement in unwanted bodily restraints made him fell physically distressed, embarrassed, demeaned, anxious and degraded."  Complaint, ECF No. 1, ¶ 107.

The Armstrong Declaration proffered by Defendants explains that "[a]ll persons transported by DOC are put in "five-point" restraints (handcuffs, waist chain, and leg irons) for the safety and protection of DOC staff, others being transported, and the public, and to prevent escape." Armstrong Decl., ECF No. 60-2 ¶ 5.  In all transport vehicles, "[a]t least two correctional officers are required to ride[.]" *Id.*  Upon arrival at the courthouse, the United States Marshals Service "removes the DOC restraints and puts on their own restraints[.]"  *Id.* ¶ 6.  According to Mr. Armstrong, "DOC's policies concerning the use of restraints were developed in accordance with, and meet the standards of, the American Correctional Association and similar professional accrediting bodies."  *Id.* ¶ 4. Furthermore, DOC's policies are "regularly reviewed to ensure that

they comply with the standards of accrediting organizations and the best practices of correctional institutions." *Id.* Additionally, "DOC correctional officers are trained, . . ., on how to properly apply restraints to persons in DOC custody to ensure security and public safety without causing injury to the person." *Id.*

Defendants assert that the record evidence in this case demonstrates the exercise of appropriate professional judgment, "well within the range of approaches that states around the country take in transporting forensic patients to and from court appearances." Def.'s Opp'n, ECF No. 60 , at 22. Defendants reference a national survey of the practices used to transport forensic patients (indicating that in 17 states, the justice system transports patients in connection with their court cases)[15] and other public record evidence (indicating that, for example, in Illinois, the Department of Human Services' policies authorize restraining forensic patients who are being transported outside the treatment facility).[16]

Moreover, the District's expert, Tim Gravette, has opined that DOC's policy of transporting all persons in its custody in full restraints is common in his experience and "consistent with national standards, customs and practices in the correctional profession." *See* Gravette Decl., Def.'s Ex. 4, ECF No. 60-4 ¶¶ 10, 15. Mr. Gravette conducted an informal survey of correctional systems and confirmed that restraining criminal inmates during transportation is standard practice, used by many state and federal agencies. *Id.* ¶¶ 13, 15. He opined ultimately that the District's use of restraints to transport Mr. Harris was "well within the standards of professional penological judgment." *Id.* ¶ 10.[17]

---

[15] *See https://nasmhpd.ord/content/forensic-mental-services-united-states-2014*
[16] See https://www.auditor.illinois.gov/Audit-Reports/Performance-Special-Multi/Performance-Audits/2016_Releases/16-DHS-Forensic-Transport-Full.pdf

[17] Defendants string cite cases from various courts nationwide that validate the practice of placing [prison] inmates in restraints while they are being transported from prison to the courtroom. Defs.'

Finally, Defendants argue that Plaintiff fails to provide any evidence supporting its assertion that Defendants' use of restraints is a "substantial departure from accepted professional judgment, practice or standards."  Defs.' Opp'n, ECF No. 60, at 26 (citations omitted).  Dr. Wasser's rebuttal report, attached as Ex. D. to the Lee Second Decl., ECF No. 58-1, at 272-273, indicates that his expert focus was on "whether using restraints on involuntarily committed forensic patients . . . when transporting them from the hospital to court represents a substantial deviation from typical medical judgment."  *Id.* at 272 (emphasis added).  Neither he nor anyone else proffers a competing opinion on the standards and practices applicable to decision based on correctional/penological professional judgment.  Instead, Dr. Wasser makes a blanket statement that application of "correctional and penological standards regarding inmate transfers to evaluate practices related to the transportation of forensic psychiatric patients is a misapplication of standards."  *Id.* at 273.

Plaintiff's entire argument is based upon the proposition that professional judgment must be medical or psychiatric judgment and from there, you look to medical or psychiatric standards to measure the reasonableness of that judgment.  But in this case, DOC's transport of NGRI patients and use of restraints during transport (which was approved by the Hospital) employed correctional/penological professional judgment as it was based overwhelmingly on safety and security outweighing medical concerns.  *See* Armstrong Decl. ¶ 5 (explaining that restraints are used "for the safety and protection of DOC staff, others being transported, and the public, and to prevent escape"); *see also Foster v. Phinney*, Case No. 19-cv-260 (JNE/EW), 2021 WL 1321346, at*10 (D. Minn. Jan. 20, 2021) (explaining that the "rationale for full restraints during transports and court proceedings other than trials is to protect the safety of persons in [ ] custody, law-enforcement officers, court staff, and the public").  As such, the standards used to assess

---

Opp'n, ECF No. 60, at 25.

reasonableness are correctional/penological standards.  Plaintiff's expert admittedly focused on measuring medical professional judgment against medical standards to determine reasonableness; he did not weigh in on correctional/penological judgments or standards.[18]  Accordingly, there is no evidence in the record before this Court to rebut Mr. Gravette's conclusion that the professional judgment exercised by Defendants in restraining Plaintiff during transport accorded with applicable standards of professional judgment, where the focus was on maintaining the safety and security of all persons involved in the transport, those being transported, and the community.

Defendants note that Plaintiff tries to "muddy the waters by referring repeatedly to the 'trauma inducing aspects of seclusion and restraint,'" *id.*, when that practice is "an archaic method of control or punishment of the mentally ill [that] is strictly regulated, as effective treatment strategies have evolved in recent decades."  Defs.' Opp'n, ECF No. 60, at 26 (citations omitted).  Defendants indicate further that the restrictions on use of restraints relevant to that practice "apply only to providers of mental health care *during treatment*." *Id.; see* D.C. Code § 7-1231.09(b)(restraints may only be used by hospitals, licensed residential treatment facilities, and mental health crisis emergency programs); 22A DCMR § 500.02 (2005)(regulations governing the use of restraints apply only to "mental health providers"); *cf. id.* at § 513.1 ("This chapter does *not* govern the use of legally mandated restraints," which are restraints "applied, monitored, and removed at the discretion of a law enforcement officer . . . with custody of a consumer") (emphasis

---

[18] Regarding considerations of safety and security, Dr. Wasser acknowledged the existence of these considerations insofar as "any hospital caring for such patients faces an enormous task in balancing the rights of the individuals they serve with maintaining the safety of other patients, hospital staff and the community."  Furthermore, he noted that "[i]t is clear that Saint Elizabeths Hospital and the District of Columbia . . . have attempted to devise policies and practices that address their patients' rights and significant safety concerns posed by some of the individuals they treat."  Wasser Expert Report, ECF No. 59-1, at 13.  Dr. Wasser disagreed however with what he perceived as a focus on safety that was "unduly weighted" over medical considerations concerning the use of restraints.  *Id.* at 14.

added); *id.* at § 513.1 (noting an exemption for officers with "appropriate jurisdiction for transport to . . . [t]he D.C. Superior Court[.]").  Accordingly, Plaintiff's focus on seclusion and restraint is misplaced considering the situation at issue in this case.

Defendants note also that Plaintiff relies heavily on the administrative grievance process to attempt to challenge the use of restraints.  *See* Pl.'s Mot., ECF No. 55, at 19-21 (discussing the issuance of an "advisory opinion" by DBH during an administrative grievance filed by Mr. Harris, which noted that the policy in place failed to meet the standards and norms of a state-run mental health program).  Defendants assert that "[n]otwithstanding that the Complaint never uses the word "grievance," that process is irrelevant here, as the challenged practice has been superseded."  *See* Defs.' Opp'n, ECF No. 60, at 27, n.16 (also discussing the grievance process generally and noting that there is no indication that "plaintiff requested any [ ] hearing or otherwise exhausted the grievance process.")  Plaintiff has not shown how either the existence of an administrative grievance process or any advisory opinion that was issued in connection therewith has any bearing on this Court's inquiry into whether Defendants exercised professional judgment and whether such judgment comports with appropriate standards and norms.

## IV. Conclusion

This Court concludes that Plaintiff's claims for declaratory and injunctive relief are moot because the DBH Transport Policy now requires individualized assessments as to whether restraints are necessary when transporting forensic patients who are committed after being found NGRI.  That leaves standing only Plaintiff's claim for compensatory relief, which is based on his feelings of physical distress, embarrassment and anxiety while being restrained during his transport to court. Plaintiff makes no claim that the restraints resulted in any tangible physical injury.

Regarding Plaintiff's compensatory damages claim, this Court examined first herein whether Defendants exercised professional judgment regarding the use of restraints in connection

with the transport of persons found NGRI.  While Plaintiff argues that such professional judgment must be medical or psychiatric in nature, that argument is based on a misreading of the standard set forth in *Youngberg*, a case where the Supreme balanced constitutional rights/liberty interests against relevant state interests, such as safety and security.  This Court finds that Defendants exercised professional judgment focused on safety and security concerns when they restrained Plaintiff during transport between the Hospital and court.  Such professional judgment may be presumed to be valid, and in fact, in this case, the transport policy was approved and signed by the Hospital's Chief Nurse Executive.

The Court looked next at whether such professional judgment accords with accepted standards of professional judgment, noting that such inquiry may include consideration of expert testimony.  Plaintiff challenges the expert proffered by Defendants on grounds that his expertise is not medical or psychiatric, but this challenge is based on the same misreading of *Youngberg*. Defendants' expert, who has correctional/penological expertise, is deemed qualified and his opinion admissible, and therefore, Plaintiff's motion to exclude Defendants' expert shall be denied.   Upon consideration of the record evidence in this case, including but not limited to the expert opinion and other evidence cited by Defendants, which can be afforded judicial notice, this Court concludes that Defendants' use of restraints during transport comports with accepted standards of professional judgment focused on safety and security concerns during such transport.  Plaintiff's claim for compensatory damages is therefore denied.   Accordingly, summary judgment shall be granted in favor of Defendants as no genuine issue of material fact remains as to whether professional judgment was exercised and or whether such judgment comports with the appropriate standards and norms.  A separate Order accompanies this Memorandum Opinion.

_____/s/_____
COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE